# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UGI SUNBURY LLC,

        Plaintiff,

   v.

A PERMANENT EASEMENT FOR
0.4308 ACRES, *et al.*,

        Defendants.

No. 3:16-CV-00794

(Chief Judge Brann)

## MEMORANDUM OPINION

### NOVEMBER 4, 2021

In advance of trial, the Plaintiff and Defendants filed competing motions *in limine* asking the Court to exclude the expert testimony and reports put forward by the opposing side. Both parties ask the Court to deem the opposing expert's opinions inadmissible based solely on disputed factual premises. Both parties then defend the admissibility of their experts' opinions by arguing that disputed factual premises affect only the weight of the proposed evidence, not its admissibility. A conundrum, indeed.

As happens when both parties stake out the same contradictory positions, they are both equally wrong and right. Here, the parties are correct that an expert's reliance on disputed facts is not a valid reason for excluding his opinion. As such, both motions to exclude expert testimony are denied.

## I.    BACKGROUND

### A.    Factual Background and Initial Proceedings

On May 6, 2016, energy company UGI Sunbury LLC filed its initial Complaint in Condemnation, seeking to acquire by eminent domain easements for use in constructing a natural gas transmission pipeline across the property owned by Donald and Georgia Pontius (collectively, "Pontius").[1] The Pontius property is located in the Borough of Shamokin Dam, Snyder County, Pennsylvania on a highly developed commercial strip along U.S. Route 15 referred to by some as "the Golden Strip."[2] The initial Complaint sought, among other things, a "permanent right of way and easement . . . for the purpose of constructing, operating, maintaining, altering, repairing, changing the size of, replacing and removing a pipeline and all related equipment and appurtenances thereto (including but not limited to meters, fittings, tie-overs, valves, cathodic protection equipment and launchers and receivers)" as well as a restriction on Pontius's ability to "use said permanent right of way or any part thereof for a road."[3]

On August 2, 2016, the Court granted UGI's Motion for Preliminary Injunction and Motion for Partial Summary Judgment (the "August 2016 Order"),[4] "thereby allowing [UGI] access and possession of a portion of the [Pontius]

---

[1]   Doc. 1.
[2]   Doc. 143-2, Appx. Tab 1 at 24.
[3]   Doc. 1 at ¶ 1.i.(i).
[4]   Doc. 24.

property for construction of the underground natural gas transmission pipeline and the use of temporary work space needed during construction activity."[5] Put another way, the Court granted UGI the easement rights requested in its initial Complaint—including the right to install aboveground appurtenances and prevent certain vehicle activity above the pipeline.[6]

After the Court's August 2016 Order, "UGI installed the pipeline on [Pontius's] property and restored the surface of the property."[7] Both parties then hired expert witnesses to conduct appraisals of the property.[8] On May 17, 2018, the action proceeded to a bench trial and the parties presented testimony by their respective expert witnesses.[9] After the trial, the Court issued its ruling and directed the Clerk to enter judgment in favor of Pontius in the amount of $254,228.39.[10]

On September 24, 2018, UGI filed a Notice of Appeal to the United States Court of Appeals for the Third Circuit.[11] The Third Circuit issued its decision on February 11, 2020, holding that the Court improperly admitted and relied on the testimony of Pontius's appraisal expert.[12] Accordingly, the Third Circuit vacated the Court's judgment and remanded the case for a new valuation hearing.[13]

---

[5]   Doc. 143 at 2.
[6]   Doc. 23; Doc. 24.
[7]   Doc. 143 at 2–3.
[8]   *See* Doc. 63, Ex. A (Aug. 2, 2016 Appraisal Report by Don Paul Shearer); Doc. 66, Ex. A (Feb. 19, 2016 Appraisal Report by John Gillooly and Matthew S. Krauser).
[9]   *See* Doc. 109.
[10]   Doc. 114.
[11]   Doc. 116.
[12]   *UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825 (3d Cir. 2020).
[13]   *Id*. at 837.

The Court held a status conference with the parties on April 22, 2020, and then instructed the parties to produce new valuation evidence from their respective appraisal experts by October 23, 2020.[14]

### B.    Pontius's Expert: William F. Rothman

In response to this Court's instruction, Pontius produced an appraisal report by William F. Rothman of RSR Appraisers & Analysts, dated September 28, 2020.[15] Rothman is a Certified General Appraiser as well as realtor and real estate developer.[16] He received a Bachelor of Science in Business Administration from Pennsylvania State University's SMEAL School (Real Estate and Insurance) and has been a Certified General Appraiser in the Commonwealth of Pennsylvania since August 1991.[17] Rothman has extensive appraisal and real estate experience and has been found qualified to offer expert testimony by the United States Bankruptcy Court as well as various Pennsylvania Courts of Common Pleas.[18]

In his appraisal report, Rothman analyzed the pre-taking market value of the Pontius property (i.e., the value of the property before UGI obtained the easements and constructed the pipeline) as well as the property's post-taking value (i.e., the value of the property as encumbered by UGI's easements).[19]

---

[14]   Doc. 127.
[15]   Doc. 143-2, Appx. Tab 1.
[16]   *Id*. at 12; *see also* Doc. 154, Appx. at 126–128.
[17]   Doc. 154, Appx. at 126–128.
[18]   *Id*.
[19]   Doc. 143-2, Appx. Tab 1 at 7 (valuations are "as of the date of taking August 2, 2016").

To determine the pre-taking value of the Pontius property, Rothman employed the "sales comparison approach" to value, which involves comparing the Pontius property to similar properties with publicly available sale information.[20] This methodology unfolds in two steps. First, the appraiser must determine the "highest and best use" of the subject property.[21] Rothman explained that determining the highest and best use for currently vacant land, such as the Pontius property, requires "following four criteria": (a) legally permissible, (b) physically possible, (c) financially feasible, and (d) most profitable."[22] Analyzing these criteria as applied to the Pontius property prior to the taking, Rothman issued the following opinions:

> (a) The legally permissible uses were "largely controlled by the zoning district in which the property is located"[23]; the property's zoning district[24] permits certain retail, customer service, and other commercial functions[25];
>
> (b) Given the size of the property (1.6 acres), "[t]he site could physically accommodate most of the legally allowable uses"[26];
>
> (c) "Development with a commercial use compatible with the high traffic count and the heavily developed commercial corridor such as . . . a national retail chain restaurant or convenience store would be considered financially feasible"[27]; and

---

[20]  *Id*. at 51.
[21]  *Id*. at 38–41.
[22]  *Id*. at 38.
[23]  *Id*. at 38.
[24]  Commercial Highway District (C-1) of Shamokin Dam Borough, Snyder County. *Id*. at 38.
[25]  *Id*. at 38–40.
[26]  *Id*. at 40.
[27]  *Id*.

> (d) "Development with a commercial use is viewed as maximally productive."[28]

In accordance with these findings, Rothman concluded that "the highest and best use . . . is demolition [of the current buildings on the property] and development of the site with a commercial use."[29]

Second, the appraiser must identify similar properties (based on the "property rights conveyed, financing terms, conditions of sale, date of sale, location, and physical characteristics") that can be used to estimate the adjusted "price per acre" for the subject property.[30] Here, Rothman identified three comparable properties located on "the Golden Strip" of Route 15 in Shamokin Dam.[31] Using the sale prices of the three comparable properties, with adjustments made based on identifiable differences in market conditions and site characteristics, Rothman calculated the adjusted price per acre for the Pontius property as $600,000.[32] As such, Rothman concluded that the total pre-taking value of property was $950,000.[33]

To determine the post-taking value of the Pontius property, Rothman again employed the sales comparison approach; however, this analysis incorporated the

---

[28] *Id*. at 41.
[29] *Id*.
[30] *Id*. at 51–52.
[31] *Id*. at 53–55.
[32] *Id*. at 57–60.
[33] *Id*. at 60. Rothman multiplied 1.6 acres (the size of the Pontius property) by $600,000 (the adjusted price per acre), which was $960,000. *Id*. Rothman rounded this figure to $950,000. *Id*.

burdens on the property associated with UGI's easements and therefore included different comparable properties.[34] In assessing the highest and best use of the property post-taking, Rothman noted that after the taking, the legally permitted uses of the land was dictated by not only the zoning restrictions, but also the easements detailed in the Complaint.[35] Rothman explained that the easements—in particular, the "prohibition on any use of the road"—"severely reduces the development potential of the Pontius Property."[36] Rothman opined that "the easement language effectively eliminates any practical or useful road use of the sharply sloped land southwest of the permanent easement, because such road use could not legally connect with the remainder of the land east of the pipeline easement."[37] Therefore, "the use of the existing ingress/egress at the southwest end of the property is prohibited by the easement."[38]

Rothman concluded that the "development potential" of the property is devalued by the "uncertainty regarding approval of driveway use within the permanent easement" as well as "setback restrictions contained in the Borough's zoning ordinance" and "a real risk that a land development/stormwater management plan would fail to obtain approval, given the use restrictions."[39] As

---

[34] *Id*. at 42–47, 61–72.
[35] *Id*. at 44.
[36] *Id*. at 45.
[37] *Id*.
[38] *Id*.
[39] *Id*. at 46.

such, Rothman found that the highest and best use of the Pontius property post-taking "is for restoration of the existing buildings and its continued use as a commercial property such as a used car lot, auto service or small retail store."[40]

Due to the modified highest and best use finding, Rothman selected four different comparable properties for the sales comparison approach.[41] Specifically, Rothman identified two properties located in Columbia County, and one property each from Dauphin and Montour Counties.[42] Based on the sales for the four comparable properties—with adjustments made for location, usable site acreage, and market conditions—Rothman calculated the adjusted price per square foot of the Pontius property post-taking as $110.00.[43] As such, Rothman concluded that the post-taking value of the property is $335,000.[44]

Reconciling the pre- and post-taking valuations of the Pontius property—with the "additional damage of the temporary construction easements," calculated as $27,500 subtracted from the post-taking value[45]—Rothman found that the damage the taking caused to the value of the property amounted to $642,500.[46]

---

[40] *Id*. at 47.

[41] *Id*. at 62–69.

[42] *Id*.

[43] *Id*. at 69–72.

[44] *Id*. at 72 ("3,042 SF x $110.00/SF" = $334,620, which Rothman rounded to $335,000).

[45] *See id.* at 74.

[46] *Id*. at 75 (calculated as the pre-taking value minus the post-taking value as reduced by the rental value of the temporary construction easement area—that is, $950,000 – ($335,000 – $27,000) = $642,5000).

### C.    UGI's Expert: Matthew S. Krauser

UGI also elected to introduce new valuation evidence, as it produced an appraisal report prepared by Matthew S. Krauser of Newmark Knight Frank, dated October 22, 2020.[47] Krauser holds a Bachelor of Arts in speech communication from Ithaca College and a Master of Science in real estate from New York University.[48] He is a certified general appraiser in the Commonwealth of Pennsylvania (as well as in the states of New York and New Jersey) with 26 years of experience.[49] Additionally, he is a Fellow at the Royal Institution of Certified Surveyors and holds a CRE designation from the Counselors of Real Estate.[50]

As with Rothman, Krauser was asked to analyze the market value of the Pontius property both before and after the taking occurred. In performing this task, Krauser employed the same methodology used by Rothman: he analyzed the highest and best use of the property both pre- and post-taking,[51] and then used the "sales comparison approach" to develop an opinion of the property's pre- and post-taking market value.[52] Krauser explained that the sales comparison approach "is

---

[47] Doc. 145-1, Appx. 1.
[48] Doc. 145-1, Appx. 1, Add. C.
[49] *Id.*
[50] *Id.*
[51] Doc. 145-1, Appx. 1 at 36–37.
[52] *Id.* at 39–50.

applicable to the [Pontius property] because there is an active market for similar properties and sufficient data available for analysis."[53]

For the pre-taking valuation, Krauser developed an opinion about the property's highest and best use by analyzing the four standard criteria (i.e., legally permissible, physically possible, financially feasible, and maximally productive) and determined that "[d]evelopment of the property for commercial use is the only use that meets the four tests."[54] Consistent with Rothman, Krauser concluded that the current buildings on the Property "have reached the end of their economic life from a physical and functional standpoint," and, therefore, "the highest and best use is for the improvements to be raised and a new commercial building to be developed."[55]

After determining the highest and best use of the Pontius property pre-taking, Krauser identified four comparable land sales for reference.[56] The sales of the four comparable properties "reflect a range of $650,000 – $1,000,000 per site"; with upward and downwards adjustments applied for approvals, location, and shape, "the range is "646,875 – $878,750."[57] Krauser "place[d] emphasis on each of the sales," and, as such, looked at the average sale price across all four

---

[53] *Id.* at 38. As with Rothman, Krauser found that neither the cost approach nor the income approach to value were applicable, and, as such, he "use[d] only the sales comparison approach." *Id.*

[54] *Id.* at 36.

[55] *Compare id.* at 37 *with* Doc. 143-2, Appx. Tab 1 at 41.

[56] Doc. 145-1, Appx. 1 at 40–43.

[57] *Id.* at 45.

properties to reach a total indicated value of $750,000 for the Pontius property pre-taking.[58] Krauser noted that this estimated pre-taking valuation generally aligned with the property's most recent listed price: "[A]s of 2015 the property had been listed for sale, on and off, for the past ten years at an asking price which was $790,000."[59]

For the post-taking value, Krauser determined the property's highest and best use by first analyzing the effect that UGI's easements had on the property. Krauser noted that due to the easements, "[t]he property owner is not permitted to build any structures, change the grade of the land, or plant any permanent trees or shrubbery within the permanent right of way."[60] However, in stark contrast with Rothman, Krauser stated that "it is [his] understanding that the owner may cross the easement with a paved road or driveway and can construct potential parking spaces within the easement area."[61] As such, Krauser acknowledged that "the easement area does not affect the highest and best use of the property and there is therefore no damage to the remaining area."[62]

Because he found that "the description of the property is essentially the same before and after the acquisition of the new easement," Krauser did not select new

---

[58]  *Id.*
[59]  *Id.*
[60]  *Id.* at 34.
[61]  *Compare id. with* Doc. 143-2, Appx. Tab. 1 at 45.
[62]  Doc. 145-1, Appx. 1 at 34.

comparable properties for the post-taking evaluation.[63] Instead, Krauser "determined the best way to estimate the impact of the easement is [to] focus on the market value of the underlying land at the [Pontius property]."[64] Krauser divided the pre-taking value of the property ($750,000) by the tract size (69,914 sq. ft.) to determine the market value per square foot ($10.73).[65] Krauser then multiplied the value per square foot by the size of the right of way (18,766 sq. ft.) to determine the "fee simple value" of the right of way area ($201,359).[66] Because he "conclude[d] that [UGI's easements] will not have an adverse effect on the remainder of the [Pontius property]," Krauser "utilize[d] 75% of the fee simple value in [his] valuation analysis" of the easements.[67] Put differently, Krauser multiplied the fee simple value of the right of way ($201,359) by the easements' percentage of the fee simple rights (75%) to calculate the market value of the easement ($151,019, which he rounded to $151,000).[68]

Applying these findings, Krauser determined the post-taking value of the Pontius property by subtracting from the pre-taking value ($750,000) the easement valuation ($151,000) and the temporary construction and access easements ($12,800)—that is, the "equivalent of the land encumbered for an estimated 12-

---

[63] *Id*. at 46.
[64] *Id*.
[65] *Id*.
[66] *Id*. at 48.
[67] *Id*. at 47.
[68] *Id*. at 48.

month period" for the construction of the pipeline[69]—which ultimately came to

$586,200.[70] Reconciling the pre-taking value ($750,000) and post-taking value

($586,200), Krauser concluded the difference in the property's market value was

$163,800.[71]

### D.    Procedural Posture

Prior to trial, on July 22, 2021, UGI filed a motion *in limine* to exclude

Rothman's testimony pursuant to Federal Rule of Evidence 702.[72] The following

day, July 23, 2021, Pontius responded in kind, filing a motion *in limine* to exclude

Krauser's expert testimony and report.[73] The parties fully briefed both motions.[74]

On September 20, 2021, after a pre-trial conference with counsel for both

parties, the Court issued a Scheduling Order explaining that it would conditionally

admit Rothman's and Krauser's expert testimony and reports, subject to a later

Rule 702 determination to be made following trial.[75] Both parties were therefore

permitted to present their appraisal experts at trial.[76]

The trial on this matter was held on October 12, 2021. Rothman and Krauser

presented their opinions, with both providing testimony consistent with their

---

[69]  *Id.*
[70]  *Id.* at 50.
[71]  *Id.* at 5, 51.
[72]  Doc. 142.
[73]  Doc. 144.
[74]  Rothman: Docs. 143, 147, 149; Krauser: Docs. 145, 146, 150.
[75]  Doc. 157 at 2.
[76]  *Id.*

written appraisal reports. Counsel for Pontius and UGI reiterated their objections to the expert testimony as outlined in their motions *in limine*.

The parties' motions *in limine* are now ripe for disposition.

## II.   LEGAL STANDARD

Federal Rules of Evidence 702 and 703 govern the admissibility of expert testimony and set forth certain criteria for admissibility. Expanding upon those rules, the Supreme Court of the United States explained the standard for admissibility of expert testimony in *Daubert v. Merrell Dow Pharm., Inc.*[77] In *Daubert*, the Court delegated a "gatekeeping responsibility" under Rule 702 to District Courts, which requires that trial judges determine at the outset whether an expert witness may "testify to (1) scientific knowledge that (2) will assist the trier of fact."[78] That gatekeeping function demands an assessment of "whether the reasoning or methodology underlying the testimony is scientifically valid" as well as "whether that reasoning or methodology properly can be applied to the facts in issue."[79] A District Court "exercises more control over experts than over lay witnesses," since "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it."[80]

---

[77]   509 U.S. 579 (1993).
[78]   *Id*. at 592.
[79]   *Id*. at 592–93.
[80]   *Id*. at 595 (internal quotation marks omitted).

Following *Daubert*, the Third Circuit cast expert admissibility determinations in light of three basic requirements: (1) qualification; (2) reliability; and (3) fit.[81] The qualification prong demands that the proffered expert possess sufficient "specialized knowledge" to testify as an expert.[82] To satisfy the reliability prong, an expert's opinion "must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation.'"[83] The Third Circuit has set forth eight non-exclusive factors that "a district court should take into account" when deciding the reliability of expert testimony:

> (1) whether a method consists of a testable hypothesis;
> (2) whether the method has been subject to peer review;
> (3) the known or potential rate of error;
> (4) the existence and maintenance of standards controlling the technique's operation;
> (5) whether the method is generally accepted;
> (6) the relationship of the technique to methods which have been established to be reliable;
> (7) the qualifications of the expert witness testifying based on the methodology; and
> (8) the non-judicial uses to which the method has been put.[84]

---

[81]   *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 741–43 (3d Cir. 1994).
[82]   *Id*. at 741.
[83]   *Id*. at 742 (quoting *Daubert*, 509 U.S. at 589).
[84]   *Id*. at 742 n.8.

Regarding the fit prong, the Third Circuit explained that admissibility depends on "the proffered connection between the scientific research or test result" and the "particular disputed factual issues."[85]

The burden of proof for admissibility of expert testimony falls upon the party that seeks to introduce the evidence.[86] However, as the Third Circuit has emphasized, "[t]he test of admissibility is not whether a particular [expert] opinion has the best foundation or whether it is demonstrably correct. Rather, the test is whether the particular opinion is based on valid reasoning and reliable methodology."[87] The Third Circuit further explained:

> This standard is not intended to be a high one, nor is it to be applied in a manner that requires the plaintiffs to prove their case twice—they do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable.[88]

District Courts must always be cognizant of the fact that "[t]he analysis of the conclusions themselves is for the trier of fact when the expert is subjected to cross-examination."[89]

---

[85] *Id*. at 743 (internal quotation marks omitted).
[86] *Oddi v. Ford Motor Co.*, 234 F.3d 136, 145 (3d Cir. 2000).
[87] *Id*. (internal quotation marks omitted).
[88] *Id*. (internal quotation marks omitted).
[89] *Id*. at 146 (internal quotation marks omitted).

## III.   DISCUSSION

### A.   Pontius's Expert: William F. Rothman

In its motion *in limine*, UGI asks the Court to exclude the opinion testimony and reports prepared by Pontius's appraisal expert, William F. Rothman.[90] UGI does not contest Rothman's qualifications to offer his proposed expert opinions,[91] and the Court finds that any attempt to do so would necessarily fail—Rothman is a Pennsylvania Certified General Appraiser with thirty years of experience.[92] As such, the Court finds that Rothman is qualified to offer an expert opinion about the pre- and post-taking value of the Pontius property. UGI instead argues that Rothman's testimony and report should be excluded because his opinions are unreliable and lack the necessary "fit."[93] To analyze UGI's arguments, the Court addresses separately the two opinions Rothman advances: (1) the pre-taking value of the Pontius property is $950,000; and (2) the post-taking value of the property is $355,000.[94]

### 1.   Pre-Taking Value of the Pontius Property

UGI asks the Court to exclude Rothman's opinion about the pre-taking value of the Pontius property for two reasons: (1) it contradicts this Court's prior ruling

---

[90]   Doc. 142.
[91]   Indeed, the parties stipulated that Rothman "is a qualified Real Estate Valuation Expert." Doc. 167 ¶ 11.
[92]   Doc. 154, Appx. at 126–128.
[93]   Doc. 143.
[94]   *See* Doc. 143-2, Appx. 1.

on the property's pre-taking value; and (2) it is unreliable because Rothman did not rely on—or even consider—changes in the property's list price between 2013 (when Pontius first put the property for sale) and August 2016 (the easement acquisition date).[95] Neither argument justifies excluding Rothman's valuation of the property prior to the taking.

First, the Court is not bound by its prior ruling on the Pontius property's pre-taking value.  In its decision reversing this Court's prior ruling in this case, the Third Circuit "instruct[ed]" this Court "to allow parties a reasonable opportunity, if requested, to produce new valuation evidence."[96] Acceding to this instruction, the Court granted the parties' requests to produce new valuation evidence, and both parties obliged. Indeed, at trial, neither UGI nor Pontius relied on the reports or testimony of the experts they presented at the initial trial. Both hired new experts who produced entirely new expert reports, distinct from and unencumbered by the reports prepared by their predecessors.[97] The Court declines to hold Rothman's proposed pre-taking value inadmissible simply because it differs from the proposed pre-taking value offered by the parties' prior experts, neither of whom had any involvement in the trial at hand.

Second, Pontius has established that Rothman's opinion testimony and report are sufficiently reliable to justify admission under Rule 702. As explained,

---

[95] Doc. 143 at 11–13.
[96] *UGI Sunbury LLC*, 949 F.3d at 836.
[97] *See* Doc. 143-2, Appx. 1 (Rothman Report); Doc. 145, Appx. 1 (Krauser Report).

the Third Circuit outlined eight non-exhaustive factors that District Courts must consider in deciding the reliability of expert testimony, including "whether the method is generally accepted" and "the existence and maintenance of standards controlling the technique's operation."[98] Here, Rothman employed a valuation methodology (the sales comparison approach) that is widely accepted by the appraisal community and recognized as reliable under federal and state law. Indeed, "[t]he sales comparison approach is the preferred method of valuation under federal law,"[99] and is identified by the Pennsylvania Eminent Domain Code as a valid method for determining market value.[100]

Nevertheless, UGI asserts that Rothman's opinion should be dismissed as unreliable because "no analysis of active listing is presented within [Rothman's] report, nor is any list price provided."[101] UGI notes that the Uniform Appraisal Standards specifically require analysis of all "listings of the subject property current as of the effective date of the appraisal."[102] As further support, UGI directs the Court to *Durika v. School District of Derry Township*[103] and *Pennsylvania Dep't of Transportation v. Bellas*.[104] However, as UGI acknowledges, these cases

---

[98]    *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d at 742 n.8.

[99]    *United States v. 80,794 Square Feet of Land*, 2021 WL 2154847, at *36 (M.D. Pa. May 27, 2021) (Bissoon, J.) (citing *United States v. 320 Acres of Land, More or Less in Monroe County, Florida*, 605 F.2d 762, 798 (5th Cir. 1979)).

[100]   26 Pa.C.S. § 1105(2).

[101]   Doc. 143 at 11.

[102]   *Id*. at 11–12 (citing *Uniform Standards of Appraisal Practice* (The Appraisal Foundation, 2016–17 Ed.), p. 21).

[103]   203 A.2d 474, 476 (Pa. 1964).

[104]   321 A.2d 418, 420 (Pa. Cmwlth. 1974).

establish only that a listing price "*may* be admitted into evidence as an admission by the property owner of what he considers the value of his property to be at the time he made the offer"[105]—neither case supports UGI's argument that an expert's failure to consider a property's purchase price renders his valuation opinion *per se* inadmissible.[106]

Rothman's failure to follow all strictures of the Uniform Appraisal Standards and consider all relevant information may well affect the relative weight the Court accords Rothman's valuation opinion. It does not, however, warrant dismissing as unreliable a valuation based on a widely accepted method for determining market value.

## 2.    Post-Taking Value of the Pontius Property

UGI also asks the Court to exclude Rothman's post-taking valuation of the Pontius property, arguing that Rothman's conclusion is unreliable and lacking the necessary "fit."[107] Notably, UGI's objection to Rothman's post-taking valuation is predicated exclusively on the factual and legal assumptions underlying his

---

[105]  Doc. 143 at 12–13 (emphasis added).

[106]  Although the legal authority UGI cites does not support its desired result, the Court recognizes that UGI's counsel accurately described the legal holdings at issue. Sadly, the same cannot be said for the attorneys representing Pontius. In his opposition brief, Pontius argues that *Lower Makefield Township v. Lands of Chester Dalgewicz*, 67 A.3d 772, 777 (Pa. 2013), establishes that "[o]nly consummated arms-length purchase agreements, contracts to sell, or bona fide offers are relevant and admissible," Doc. 147 at 14 (internal citation omitted). But it says no such thing. The Pennsylvania Supreme Court in *Dalgewicz* held that a letter of intent, which "constituted a bona fide offer and was relied on by a qualified valuation expert in formulating an opinion, was admissible evidence of the fair market value of the property," 67 A.3d at 777— it did not specify that *only* such bona fide offers were relevant and admissible.

[107]  Doc. 143 at 13–20.

conclusions; UGI does not contest the reliability or "fit" of the method Rothman employed or his application of that method.[108] Because the pretrial record did not clearly and indisputably demonstrate that Rothman's factual predicates were incorrect, UGI's disagreements about the evidence and assumptions Rothman relied on are not a valid basis for excluding expert testimony.

Although Rule 702 provides that an expert's testimony must be "based on sufficient facts or data,"[109] this requirement "is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other."[110] The Third Circuit has held that "[i]n performing its gatekeeping function, and, in particular, in deciding whether an expert's report meets the reliability factor of a Daubert and Rule 702 analysis, the District Court is not to weigh the evidence relied upon or determine whether it agrees with the conclusions reached therein."[111] The Third Circuit explained that "[t]o the contrary, the role of the District Court is simply to evaluate whether the *methodology* utilized by the expert is reliable, i.e., whether, when correctly employed, that methodology leads to testimony helpful to the trier of fact."[112] As such, when an expert's testimony is "contradicted by other evidence, . . . the existence of [such] conflicting evidence [is] not a basis on which to exclude [the

---

[108] *Id*.
[109] Fed. R. Evid. 702(a).
[110] Fed. R. Evid. 702 advisory committee's notes (emphasis added).
[111] *Walker v. Gordon*, 46 Fed. Appx. 691, 695 (3d Cir. 2002).
[112] *Id*.

expert's] testimony."[113] The proper means for exploring disputed facts is on cross

examination, as "[d]eterminations regarding the weight to be accorded, and the

sufficiency of, the evidence relied upon by the proffered expert, are within the sole

province of the [trial of fact]."[114]

Here, UGI argues that Rothman "grossly exaggerated the impact of the very

existence of the pipeline on market value" because he "misconstrued" language in

the Complaint as "prohibit[ing] vehicle passage or parking above the underground

pipeline" and thus reached an incorrect conclusion about the potential use of the

"sharply sloped land" located southwest of the pipeline on the Pontius property.[115]

UGI further contests the factual validity of Rothman's opinion that the "risk that a

land development/stormwater management plan would fail to obtain approval"

may "devalue[]" the Property's "development potential," and asserts that Rothman

miscalculated the area for a potential building on the property.[116]

These arguments concern only the sufficiency of the evidence Rothman

relied on (and the conclusions drawn therefrom), and as such, are not valid bases

for excluding Rothman's testimony or reports. Although UGI believes that

Rothman ignores "the actual conditions of the easement,"[117] the question of how

the easement prohibiting use of the "permanent right of way or any part thereof for

---

[113] *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 290 (3d Cir. 2012).
[114] *Walker*, 46 Fed. Appx. at 695.
[115] Doc. 143 at 13–18.
[116] *Id.* at 18–20.
[117] *Id.* at 14.

a road"[118] affects the landowner's use of the Pontius property—and therefore

decreases the value of the property—remains an open question.[119] The Court, as

the trier of fact, will ultimately have to resolve this factual dispute, but the mere

existence of this disputed fact does not render Rothman's related opinions

inadmissible.[120] Likewise, UGI's objections to Rothman's conclusions regarding

approval of any land development/stormwater management plan and the available

building space on the Property are factual issues that go to the weight, not the

admissibility, of Rothman's expert opinions.[121]

    The Court finds that Pontius successfully established that Rothman is

qualified to opine on the pre- and post-taking value of the Pontius property, and

that Rothman's opinions are sufficiently reliable and applicable to the matter at

hand. Therefore, UGI's motion *in limine* to exclude Rothman's expert testimony

and reports is denied.

### B.    UGI's Expert: Matthew S. Krauser

    In an interesting role-reversal, Pontius asks the Court to exclude UGI's

expert, Matthew S. Krauser, based solely on the same factual dispute raised in

---

[118]  Doc. 1 ¶ 1(i).

[119]  UGI notes that this "language of the original complaint was subsequently amended (Doc. 138) pursuant to Fed. R. Civ. ¶. 71.1(f) to remove the specific wording that [Rothman] has misconstrued." Doc. 143 at 14. However, the Court rejected UGI's attempt to unilaterally rescind this and other easement rights by amending its Complaint. *See* Doc. 160; Doc. 161. As such, the original Complaint remains the operative complaint in this case, and the disputed language is recognized as part of the easement UGI obtained on August 2, 2016. *Id.*

[120]  *See Walker*, 46 Fed. Appx. at 695–96.

[121]  *Id.*

UGI's motion *in limine*. But, again, an expert's reliance on disputed facts does not render his testimony and reports inadmissible.[122]

As with UGI and Rothman, Pontius does not contest Krauser's qualifications to offer expert testimony on the pre- and post-taking value of the Pontius property,[123] and any attempt to do so would be futile. The Court finds that Krauser is abundantly qualified to opine on this subject.[124] Instead, Pontius challenges the reliability of Krauser's valuation on two related grounds: (1) Krauser's opinion is predicated on his understanding that the easement area can still be used for a driveway or for vehicle parking[125]; and (2) Krauser did not conduct a proper "before and after" appraisal because his post-taking valuation of the Pontius property assessed only the "direct damages associated with the property physically taken."[126] The Court does not find either a valid basis for excluding Krauser's expert testimony and reports.

First, Pontius's objection based on the facts Krauser relied on is the mirror image of UGI's objection to Rothman. As discussed, the parties disagree about the meaning and effect of the easement language in the Complaint prohibiting the "use

---

[122] *Id.*

[123] The parties stipulated that Krauser "is a qualified Real Estate Valuation Expert." Doc. 167 ¶ 12.

[124] As noted, Krauser is a certified general appraiser with 26 years of experience and multiple commendations and designations from reputable organizations in the appraisal community. *See* Doc. 145-1, Appx. 1, Add. C.

[125] Doc. 145 at 9–15.

[126] Doc. 150 at 11; *see also* Doc. 145 at 19–22.

[of] said permanent right of way or any part thereof for a road."[127] Pontius believes this language effectively prohibits the landowner from permitting vehicle traffic or parking above the pipeline.[128] UGI interprets this language more narrowly as prohibiting only a "highway"; it does not prevent the property owner from using the easement area as a driveway or parking lot.[129] Pontius's expert, Rothman, accepted Pontius's interpretation of this provision.[130] UGI's expert, Krauser, accepted UGI's interpretation.[131] This is a factual dispute for the trier of fact to resolve, not a reason to exclude expert testimony.[132]

Second, Pontius mischaracterizes the methodology Krauser employed. Pontius argues that Krauser conducted a "strip appraisal"—that is, "an appraisal of only the land taken without a sincere attempt to determine harm to the remainder property"—"disguised as a 'before and after' appraisal."[133] That is not true. As explained, Krauser analyzed the highest and best use of the Pontius property both before and after the taking and found that "the description of the property is essentially the same before and after the acquisition of the new easement."[134] He

---

[127] Doc. 1 ¶ 1(i).
[128] Doc. 145 at 11–15.
[129] Doc. 146 at 11.
[130] Doc. 143-2, Appx. Tab 1 at 45.
[131] Doc. 145-1, Appx. 1 at 34.
[132] *See Walker*, 46 Fed. Appx. at 695–96.
[133] Doc. 145 at 21, 21 n.1.
[134] Doc. 145-1, Appx. 1 at 45–46.

therefore concluded that "the best way to estimate the impact of the easement [was to] focus on the market value of the underlying land at the Pontius property."[135]

Again, the dispute here is a factual one. Because Krauser accepted that UGI's easements do not prevent vehicle traffic and parking above the pipeline, he found that the "description" of the property effectively remained the same.[136] Pontius may disagree with the factual assumptions underlying Krauser's methodology, but that does not render Krauser expert opinions inadmissible.[137]

## IV.    CONCLUSION

Both parties successfully established that their appraisal experts are qualified to opine on the pre- and post-taking value of the Pontius property, and that their opinions are sufficiently reliable and connected to the issue at hand. The parallel motions *in limine* to exclude the experts' testimony and reports are premised solely on disputes over the facts the experts relied on. But an expert's reliance on

---

[135] *Id*.

[136] *Id*.

[137] Pontius also argues that Krauser's report "definitely should not be acceptable to a Court of Law" because Krauser "fail[ed] to value the improvements" on the Pontius property. Doc. 145 at 22. But Pontius provides no explanation or legal support for why he believes that Krauser's decision not to appraise the existing buildings on the property constitutes a "substantial error or omission that significantly affects his or her opinion or conclusion." *Id*. (citing *Uniform Standards of Appraisal Practice*, Standard 3–1). That's probably for the best, as this criticism applies equally to Pontius's expert, Rothman. Indeed, neither Rothman nor Krauser attempt to quantify the effect the existing structures have on the property's pre-taking value, and both conclude that the highest and best use of the property can be obtained only by demolishing those buildings. *See* Doc. 143-2, Appx. Tab 1 at 41 (Rothman: "The value of the property for commercial use in its 'before' condition would be enhanced by demolition of the existing buildings."); *accord* Doc. 145-1, Appx. 1 at 37 (Krauser: "The highest and best use is for the improvements to be razed and a new commercial building to be developed."). The Court declines to exclude Krauser's and Rothman's testimony and reports on this basis.

disputed facts affects only the weight, not the admissibility, of his opinions.

Therefore, the motions *in limine* are denied.

An appropriate Order follows.

BY THE COURT:


*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge