# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UGI SUNBURY LLC, | No. 3:16-CV-0794 |
| Plaintiff, | (Chief Judge Brann) |
| v. | |
| A PERMANENT EASEMENT FOR 0.438 ACRES, *et al.*, | |
| Defendants. | |

## MEMORANDUM OPINION

### DECEMBER 13, 2021

More than five years ago, energy company UGI Sunbury LLC obtained the easements it needed to construct a natural gas pipeline that cut through the property owned by Donald Pontius and his wife. But because the parties were unable to reach agreement on the amount UGI owed Pontius for the easements, they decided to settle the matter in court. This litigation ensued, resulting in two separate bench trials involving four different appraisal experts and an appeal to the Court of Appeals. Now, having reviewed the evidence and considered the parties' respective positions, the Court is prepared to resolve the matter—hopefully, this time, for good.

## I.    BACKGROUND

On May 6, 2016, UGI filed its initial Complaint in Condemnation, seeking to acquire by eminent domain easements for use in constructing a natural gas transmission pipeline across the Pontius property in the Borough of Shamokin Dam, Snyder County, Pennsylvania.[1] The initial Complaint sought, among other things, a "permanent right of way and easement . . . for the purpose of constructing, operating, maintaining, altering, repairing, changing the size of, replacing and removing a pipeline and all related equipment and appurtenances thereto (including but not limited to meters, fittings, tie-overs, valves, cathodic protection equipment and launchers and receivers)" as well as a restriction on Pontius's ability to "use said permanent right of way or any part thereof for a road . . . without first having obtained [UGI's] approval in writing."[2]

On August 2, 2016, the Court granted UGI's Motion for Preliminary Injunction and Motion for Partial Summary Judgment (the "August 2016 Order"),[3] "thereby allowing [UGI] access and possession of a portion of the [Pontius] property for construction of the underground natural gas transmission pipeline and the use of temporary work space needed during construction activity."[4] Put another

---

[1]   Doc. 1.
[2]   *Id*. at ¶ 1.i.(i).
[3]   Doc. 24.
[4]   Doc. 143 at 2.

way, the Court granted UGI the easement rights requested in its initial Complaint—including the right to install aboveground appurtenances and prevent certain vehicle traffic above the pipeline.[5]

After the Court's August 2016 Order, "UGI installed the pipeline on [Pontius's] property and restored the surface of the property."[6] Both parties then hired expert witnesses to conduct appraisals of the property.[7] On May 17, 2018, the action proceeded to a bench trial and the parties presented testimony by their respective expert witnesses.[8] After the trial, the Court issued its ruling and directed the Clerk to enter judgment in favor of the Defendants in the amount of $254,228.39.[9]

On September 24, 2018, UGI filed a Notice of Appeal to the United States Court of Appeals for the Third Circuit.[10] The Third Circuit issued its decision on February 11, 2020, holding that the Court improperly admitted and relied on the testimony of Pontius's appraisal expert.[11] Accordingly, the Third Circuit vacated this Court's judgment and remanded the case for a new valuation hearing.[12]

---

[5] Doc. 23; Doc. 24.
[6] Doc. 143 at 2–3.
[7] *See* Doc. 63, Ex. A (Aug. 2, 2016 Appraisal Report by Don Paul Shearer); Doc. 66, Ex. A (Oct. 19, 2015 Appraisal Report by John Gillooly and Matthew S. Krauser).
[8] *See* Doc. 109.
[9] Doc. 114.
[10] Doc. 116.
[11] *UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825 (2020).
[12] *Id.* at 837.

The Court held a status conference with the parties on April 22, 2020, and then instructed the parties to produce new valuation evidence from their respective appraisal experts by October 23, 2020.[13] The parties did so: Pontius produced a report by William F. Rothman of RSR Appraisers & Analysts, dated September 28, 2020,[14] and UGI produced a report by Matthew Krauser of Newmark Knight Frank, dated October 22, 2020.[15] In their appraisal reports, Rothman and Krauser analyzed the pre-taking market value of the Pontius property (i.e., the value of the property before UGI obtained the easements and constructed the pipeline) as well as the property's post-taking value (i.e., the value of the property as encumbered by UGI's easements).[16] Although both experts used the same "sales comparison approach"[17] to calculate the pre- and post-taking value of the Pontius property,

---

[13] Doc. 127.

[14] Ex. D-1 (Sept. 28, 2020 Appraisal Report by William F. Rothman).

[15] Ex. P-5 (Oct. 22, 2020 Appraisal Report by Matthew Krauser).

[16] Ex. D-1 (Sept. 28, 2020 Appraisal Report by William F. Rothman) at 7 (valuations are "as of the date of taking August 2, 2016").

[17] The "sales comparison approach" to value involves comparing the Pontius property to similar properties with publicly available sale information. *See id*. at 51; *see also* Ex. P-5 (Oct. 22, 2020 Appraisal Report by Matthew Krauser) at 38. This methodology unfolds in two steps: first, the appraiser must determine the "highest and best use" of the subject property; and second, the appraiser must identify similar properties (based on the "property rights conveyed, financing terms, conditions of sale, date of sale, location, and physical characteristics") that can be used to estimate the price of the subject property. *See* Ex. D-1 (Sept. 28, 2020 Appraisal Report by William F. Rothman) at 38–41, 51–52; *see also* Ex. P-5 (Oct. 22, 2020 Appraisal Report by Matthew Krauser) at 36–37, 39–50. The appraiser conducts this analysis for the subject property both pre- and post-taking and then determines the damage attributable to the taking by subtracting the post-taking value from the pre-taking value. *See* Ex. D-1 (Sept. 28, 2020 Appraisal Report by William F. Rothman) at 74–75; *see also* Ex. P-5 (Oct. 22, 2020 Appraisal Report by Matthew Krauser) at 51.

they reached dramatically different conclusions about the value of the property and the cost of the taking. Specifically, Rothman found that the damage the taking caused to the value of the property amounted to $642,500,[18] while Krauser concluded the damage was only $163,800.[19]

Prior to trial, on July 22, 2021, UGI filed a motion *in limine* to exclude Rothman's testimony pursuant to Federal Rule of Evidence 702.[20] The following day, July 23, 2021, Pontius responded in kind, filing a motion *in limine* to exclude Krauser's expert testimony and report.[21] On September 20, 2021, after a pre-trial conference with counsel for both parties, the Court issued a Scheduling Order explaining that it would conditionally admit Rothman's and Krauser's expert testimony and reports, subject to a later Rule 702 determination to be made following trial.[22] Both parties were therefore permitted to present their appraisal experts at trial.[23]

The trial on this matter was held on October 12, 2021.[24] Pontius presented two witnesses: his appraisal expert, Rothman, and Arthur Bowen, a real estate

---

[18] Ex. D-1 (Sept. 28, 2020 Appraisal Report by William F. Rothman) at 75 (calculated as the pre-taking value minus the post-taking value as reduced by the rental value of the temporary construction easement area—that is, $950,000 – ($335,000 – $27,000) = $642,5000).

[19] Ex. P-5 (Oct. 22, 2020 Appraisal Report by Matthew Krauser) at 51.

[20] Doc. 142.

[21] Doc. 144.

[22] Doc. 157 ¶ 4.

[23] *Id*.

[24] *See* Doc. 172.

broker familiar with the Pontius property's listing history as well as the commercial real estate market in the surrounding area.[25] UGI likewise called two witnesses[26] in its case in chief: its appraisal expert, Krauser, and Casey Monagan, the UGI project manager who oversaw the construction of the pipeline underneath the Pontius property.[27]

Following the trial, on November 4, 2021, the Court denied the Plaintiff's and Defendants' competing motions *in limine* to exclude the expert testimony and reports put forward by the other side.[28] As such, the testimony and exhibits of Rothman and Krauser were admitted into evidence.

On November 24, 2021, UGI submitted its post-trial brief and proposed findings of fact.[29] Pontius did the same.[30] As such, this case is now ripe for disposition.

## II.   DISCUSSION

Following the one-day bench trial, the sole remaining issue before the Court is the amount of money Pontius deserves as just compensation and damages for the easements UGI obtained to construct its pipeline under the Pontius property. As the

---

[25]   *Id*. at 8:14–134:9.
[26]   UGI also called the Plaintiff, Donald Pontius, as a hostile witness subject to examination as if on cross; however, Mr. Pontius was unable to recall the facts at issue or otherwise offer substantive testimony. *Id*. at 105:1–110:3.
[27]   *Id*. at 138:17–279:19.
[28]   Doc. 173; Doc. 174.
[29]   Doc. 175; Doc. 176.
[30]   Doc. 177; Doc. 178.

Third Circuit held in *Tennessee Gas Pipeline Co., LLC v. Permanent Easement for 7.053 Acres*,[31] federal courts must follow the provisions of Chapter 7 of the Pennsylvania Eminent Domain Code[32] in determining just compensation in an eminent domain action under the Natural Gas Act. Accordingly, to calculate just compensation, the Court must proceed in four steps: (1) determine the property's pre-taking value; (2) assess the effect of the easements on the property and decide the property's post-taking value; (3) determine the value of the temporary construction easement; and (4) reconcile the three preceding valuations to reach a conclusion on the amount UGI owes Pontius.[33] Under Pennsylvania law, this amount may be supplemented with an award for "professional fees"[34] and "delay compensation."[35]

### A.     Pre-Taking Value

To determine the Pontius property's pre-taking value—that is, the market value of the property as of August 2, 2016, before UGI obtained the easements needed to construct the pipeline—the Court must assess the valuations offered by the parties' experts, William F. Rothman (Pontius) and Matthew S. Krauser (UGI). Although Rothman and Krauser employed the same valuation methodology (the

---

[31]   931 F.3d 237, 255 (3d Cir. 2019).
[32]   26 Pa. C.S. § 701 *et seq*.
[33]   26 Pa. C.S. §§ 702(a), 703.
[34]   26 Pa. C.S. § 710.
[35]   20 Pa. C.S. § 713.

sales comparison approach), they reached substantially different conclusions about the property's pre-taking value: Rothman valued the property at $950,000,[36] and Krauser valued it at $750,000.[37] After hearing the experts' testimony and reviewing their reports, the Court concludes that Krauser's valuation more accurately reflects the pre-taking value of the Pontius property.

For their analyses of the property's pre-taking value, both Rothman and Krauser concluded that the highest and best use would be achieved by demolishing the current buildings on the property and then developing the land for commercial use.[38] Rothman and Krauser diverge, however, in the comparable properties they select. Rothman selected three properties for comparison and, based on the sales data, calculated the adjusted price per acre for the Pontius property as $600,000; the pre-taking value of the property, which is 1.6 acres, was therefore $950,000.[39] Krauser critiqued Rothman's selections, arguing that Rothman's "comparable land site three appears to be most relevant to the market value after the acquisition" and that his selected price unit ("price per acre") differed from the "typical analysis."[40]

---

[36]   Ex. D-1 (Sept. 28, 2020 Appraisal Report by William F. Rothman) at 60.

[37]   Ex. P-5 (Oct. 22, 2020 Appraisal Report by Matthew Krauser) at 45.

[38]   *See* Ex. D-1 (Sept. 28, 2020 Appraisal Report by William F. Rothman) at 41; Ex. P-5 (Oct. 22, 2020 Appraisal Report by Matthew Krauser) at 36–37.

[39]   Ex. D-1 (Sept. 28, 2020 Appraisal Report by William F. Rothman) at 53–60.

[40]   Ex. P-6 (Apr. 15, 2021 Appraisal Review Report by Matthew Krauser) at 16–17.

In contrast, Krauser selected four comparable properties with an adjusted sales range of "$646,875 – $878,750" per site, which he averaged to $750,000.[41] Rothman criticized Krauser's analysis, arguing that Krauser failed to accurately account for differences in the property sizes and the market conditions at the time of the sales, and also made incorrect assumptions based on site location and improvements.[42] As expected, both experts defended their property selections, adjustment calculations, and units of comparison when testifying at trial.[43]

Although these disagreements are undoubtedly relevant, the Court finds most persuasive Krauser's analysis of the list price of the Pontius property between May 2011 and August 2016.[44] As UGI notes, the Uniform Standards of Appraisal Practice Rule 1-5 requires appraisers to analyze "the listing history where no other price information is available to them so as to avoid overvaluing the property."[45] Moreover, the Supreme Court of Pennsylvania has held that an offer by an owner to sell his property at a specified price is admissible evidence that reflects his or her beliefs regarding the value of the property.[46]

---

[41] Ex. P-5 (Oct. 22, 2020 Appraisal Report by Matthew Krauser) at 45.

[42] Ex. D-19 (Jan. 18, 2021 Appraisal Review Report by William F. Rothman) at 5–6.

[43] Doc. 172 (Oct. 12, 2021 Trial Tr. (W. Rothman Testimony)) at 59:9–67:22; *see also id.* (M. Krauser Testimony)) at 191:17–192:18, 209:1–211:16.

[44] *See* P-6 (Apr. 15, 2021 Appraisal Review Report by Matthew Krauser) at 9.

[45] Doc. 176 at 6.

[46] *See Durika v. School District of Derry Township*, 203 A.2d 474, 484 (Pa. 1964) ("An offer by an owner to sell his property as a specified price, as well as the purchase price of the land, is admissible if not too remote in time."); *see also Pennsylvania Dept. of Transportation v. Bellas*, 321 A.2d 418, 420 (Pa. Cmmwlth. 1974) ("Of course it is the law in Pennsylvania that

Here, Pontius listed the property at $950,000 in February 2013—three years before the relevant date at issue.[47] In May 2014, the final listing date available before the pipeline was announced, the property was listed at $790,000.[48] Although these price listings are not definitive statements of market value, they serve as helpful barometers for assessing the validity of the experts' proposed pre-taking valuations. As such, the Court finds it difficult to credit Rothman's pre-taking valuation of $950,000. Although Pontius listed the property at this price in 2013, the list price "had been reduced multiple times before the date of acquisition."[49] Indeed, in the ensuing three years, Pontius lowered the list price by $160,000—and that was still fifteen months prior to the relevant appraisal date at issue here.

In his appraisal report, Krauser stated that "[i]t is unreasonable to assume that the market value (in the before scenario) is equal to, or greater than, the asking price for the property."[50] Krauser reiterated that position when testifying at trial:

> A listing is a benchmark typically of the most the
> property would sell for. . . . Typically, a property does
> not sell for more than the listing price because a willing
> buyer and a willing seller are going to come to a meeting
> of the minds. And a competent purchaser is going to
> know that typically, if there is a listing price, there's a
> gap that's typically found between the actual sale price

---

an offer by a property owner to sell, if not too remote in time, may be admitted into evidence as an admission of what he considers the value of his property to be at the time he made the offer.").

[47] Ex. P-6 (Apr. 15, 2021 Appraisal Review Report by Matthew Krauser) at 9.

[48] *Id.*

[49] *Id.*

[50] *Id.*

and a listing price. And that's because the negotiations
occur.[51]

Art Bowen, the real estate broker who testified on behalf of Pontius, agreed, stating
that a willing buyer would not pay $950,000 for a property that was listed for
$650,000.[52] The Court finds this testimony credible and persuasive.[53]

Given the decline in the list price for the property prior to the announcement
of the pipeline, the Court concludes that Krauser's valuation of the Pontius
property pre-taking accurately reflects the property's market value as of August 2,
2016. Therefore, the Court finds that the pre-taking value of the Pontius property is
$750,000.

## B.   Post-Taking Value

Having determined the appropriate pre-taking value for the Pontius property,
the Court must now turn to the post-taking value—that is, the market value of the
property as encumbered by the easements UGI obtained. As with the pre-taking

---

[51]  Doc. 172 (Oct. 12, 2021 Trial Tr. (M. Krauser Testimony)) at 182:24–183:15.

[52]  *Id*. (A. Bowen Testimony) at 127:16–19 ("Q. Yes. With your experience in the marketplace
and the relevant area we're talking about, would a willing buyer pay 950,000 for a property
that's listed for 650,000? A. Not if it's listed for 650, they wouldn't pay 950.").

[53]  At trial, Rothman testified that he did not review the available price listings for the Pontius
property. *Id*. (W. Rothman Testimony) at 88:9–12. When asked whether "the listing prices
[are] relevant to your analysis," Rothman responded, "No, not really." *Id*. at 88:13–14.
Although Rothman is an experienced real estate appraiser who is eminently qualified to offer
an expert opinion on property valuation, this testimony is altogether unconvincing. Given that
the Uniform Standards of Appraisal Practice explicitly require appraisers to analyze price
listings of the subject property current as of the appraisal date, and the logical relationship
between a property's list price and prospective buyers' assessments of the property's value, it
seems inconceivable that a real estate appraiser wouldn't consider the listing history relevant
to a market value determination.

value, the parties' respective appraisal experts offer dramatically different valuations for the property post-taking. But the reason for this divergence is distinct. The difference in the post-taking valuations stems from the experts' assumptions about the proper interpretation and effect of two provisions of the easement rights taken: (1) "Defendants shall not . . . use said permanent right of way or any part thereof for a road"; and (2) "without first having obtained Plaintiff's approval in writing."[54]

### 1.      Restriction on the Use of the Right of Way "For a Road"

To calculate the Pontius property's post-taking value, the Court must first assess what type of activity is prohibited by the easement right restricting Pontius's "use [of the] permanent right of way or any part thereof for a road."[55] In essence, the Court must determine what constitutes a "road" within the context of UGI's easements.

Pontius interprets this specific easement right as prohibiting the landowner from permitting vehicle traffic or parking above the pipeline.[56] Pontius's appraisal expert, Rothman, concurred, explaining that "[a]ny paved road is obviously prohibited by [this] language," and "[a] driveway would [likewise] be prohibited . . . if it is considered a road, a permanent structure, interference with access or an

---

[54]   Doc. 1 ¶ 1(i).
[55]   *Id.*
[56]   Doc. 145 at 11–15.

interference with UGI['s] lawful use of rights."[57] UGI disagrees, arguing that the "Defendants are not precluded by the terms of use of the permanent pipeline easement from utilizing the surface of the easement for a paved parking area and for vehicle access to and from such a parking area."[58] At trial, the UGI project manager responsible for overseeing the pipeline project, Casey Monagan, testified that parking is permitted over the top of the easement on the Pontius property and the amount of groundcover over the pipeline is sufficient to protect the pipeline from vehicle passage on the asphalt above the pipeline.[59] As such, UGI's appraisal expert, Krauser, explained that "it is [his] understanding that the owner may cross the easement with a paved road or driveway and can construct potential parking spaces within the easement area."[60]

In support of his proffered interpretation, Pontius directs the Court to Section 102 of the Pennsylvania Motor Vehicle Code,[61] which details the definitions of certain "words and phrases when used in this title."[62] Pontius argues that Section 102 of the Motor Vehicle Code contains two definitions relevant to the instant issue:

---

[57]  Ex. D-1 (Sept. 28, 2020 Appraisal Report by William F. Rothman) at 45.
[58]  Doc. 153 ¶ 26; *see also* Doc. 146 at 11 ("[T]he reference in the descriptive language of the original complaint to a 'road' was not intended to prohibit vehicle passage or parking above the underground pipeline.").
[59]  Doc. 172 (Oct. 12, 2021 Trial Tr. (C. Monagan Testimony)) at 148:13–23, 150:6–21.
[60]  Ex. P-5 (Oct. 22, 2020 Appraisal Report by Matthew Krauser) at 34.
[61]  *See* Doc. 172 (Oct. 12, 2021 Trial Tr.) at 99:11–100:4.
[62]  75 Pa. C.S. § 102.

- "Highway": "The entire width between the boundary lines of every way publicly maintained when any part thereof is open to the use of the public for purposes of vehicular travel."[63]

- "Private road or driveway": "A way or place in private ownership and used for vehicular travel by the owner and those having express or implied permission from the owner, but not by other persons."[64]

In contrast, UGI asks the Court to accept the "ordinary, commonsense meaning" of the word "road," pointing to the *Merriam-Webster Dictionary* definition: "[A]n open way for vehicles, persons, and animals: HIGHWAY."[65] UGI argues that this definition "does not include a parking lot," and "[o]f course, no one ever intended to use the subject property as a highway."[66]

Pontius does not cite, and the Court is not aware of, any legal authority applying the Motor Vehicle Code definition of "[p]rivate road or driveway" to road-use prohibitions included in easements in the eminent domain context. Conversely, UGI's argument that words in an easement should be given their "ordinary, commonsense meaning" comports with the approach endorsed by the Supreme Court of Pennsylvania, which has held that words "take their plain meaning in establishing the intent of the parties and the nature and extent of the easement."[67] In *Moody v. Allegheny Valley Land Trust*, the Pennsylvania Supreme

---

[63]  *Id.*

[64]  *Id.*

[65]  Doc. 146 at 11 (citing *Merriam-Webster Dictionary* (11th ed. 2004)).

[66]  *Id.*

[67]  *Baptist Church in Great Valley v. Urquhart*, 178 A.2d 583, 586 (Pa. 1962); *see also Naylor v. Board of Supervisors of Charlestown Township*, 253 A.3d 786, 816 (Pa. Cmmwlth. 2021)

Court applied the plain meaning maxim when analyzing an easement concerning "the use and purposes of [a] Road."[68] The Pennsylvania Supreme Court adopted the following American Heritage Dictionary definition for "road": "[A]n open, generally public way for the passage of vehicles, people, and animals," "the surface of a road; a roadbed," "a course or path," or "a railroad."[69]

The dictionary definition of "road" accepted by the Pennsylvania Supreme Court in *Moody* aligns with that offered by UGI—both recognize that "road," as commonly understood, refers to an "open" and "generally public" way designed for vehicle passage. Neither a parking lot nor a property ingress/egress point (i.e., the current paved space sitting atop the easement area) falls within these definitions.

The Court accepts UGI's proposed definition for "road" as used in the Complaint, and, therefore, rejects Pontius's proffered interpretation of the easement language at issue. In so doing, the Court finds that Rothman's post-taking value of the Pontius property is without factual support. This definition of "road"—that is, a throughway that is "open" and "generally public"—renders inaccurate the following two assumptions underlying Rothman's post-taking

---

(Ceisler, J., concurring in part) ("[W]hen considering . . . conservation easements, the plain meaning of the words used therein remains our touchstone in determining the purpose animating such easements.").

[68] 976 A.2d 484, 491 (Pa. 2009).

[69] *Id*. (citing The American Heritage Dictionary of the English Language (4th ed. 2000)).

valuation: (1) the "use of the existing ingress/egress at the southwest end of the property is prohibited by the easement"; and (2) the "sharply sloped land southwest of the permanent easement . . . is completely unusable for development" because "such road use could not legally connect with the remainder of the land east of the pipeline easement."[70] Rothman's conclusions about the highest and best use of the Pontius property post-taking are therefore incorrect and the comparable properties based thereon are inapplicable.[71]

That leaves the Court with only Krauser's post-taking valuation. Because the easement language prohibiting "the use of said permanent right of way or any part thereof for a road"[72] does not preclude the landowner from "utilizing the surface of

---

[70] Ex. D-1 (Sept. 28, 2020 Appraisal Report by William F. Rothman) at 45.

[71] Separately, Pontius and Rothman assert that "the highest and best use after the condemnation is significantly different than before the taking due to the inability to develop a working site plan that would not intrude upon UGI's easement rights." Doc. 154 at 8. At trial, Pontius introduced as evidence a 2009 site plan for the construction of a Sonic Drive-In fast-food restaurant location, which included drainage basins and stormwater pipes that sat on or ran through what is now the easement area. *See* Def. Ex. 17. Rothman testified that the Sonic Drive-In depicted in the site plan is "what [he] had in mind for [the] maximally productive" use of the property, but that due to UGI's easement, construction consistent with the Sonic site plan was no longer "physically possible." Doc. 172 (Oct. 12, 2021 Trial Tr. (W. Rothman Testimony)) at 36:23–37:3, 38:10–50:25. However, the issue here is not whether *this* specific site plan can be implemented, but, rather, whether *any* commercial site plan can be developed such that the Pontius property post-taking can still be used for commercial development. Addressing this issue for UGI, Monagan testified that the Sonic site plan could be "redesigned" to accommodate the pipeline and UGI would be willing to "work with the owner to reconfigure, redesign, or make accommodations to help the development out." *Id.* (C. Monagan Testimony) at 151:21–155:9. The Court found Monagan's testimony credible and persuasive. Pontius, on the other hand, failed to offer any meaningful rebuttal evidence: Rothman acknowledged that as an appraiser and not a civil engineer, testifying about whether "the Sonic plan conceivably could be reconfigured to actually work on [the Pontius] property" was "beyond [his] expertise." *Id.* (W. Rothman Testimony) at 85:9–86:25.

[72] Doc. 1 ¶ 1.i.(i).

the easement for a paved parking area and for vehicle access to and from such a parking area,"[73] Krauser is correct in finding that "the description of the [Pontius] property is essentially the same before and after the acquisition of the new easement."[74] Therefore, the Court accepts Krauser's approach to determining the property's post-taking value—that is, subtracting the easement valuation from the pre-taking value of the property—as well as his ultimate conclusion about the property's post-taking value.[75]

### 2.     With UGI's Written Approval

Even if the Court accepted Pontius's proposed definition of "road" within this context, that would not necessarily obligate the Court to accept Rothman's proposed post-taking value for the Pontius property. Instead, the Court would need to assess the effect of the easement language permitting the landowner to construct a "road" over the pipeline if it first obtains UGI's "approval in writing."[76]

As noted, Rothman opined that "the easement language effectively eliminates any practical or useful road use of the sloped land southwest of the permanent easement" as well as "the existing ingress/egress at the southwest end of the property."[77] Because Rothman found that the "road" use restrictions prevent

---

[73]  Doc. 153 ¶ 26.
[74]  Ex. P-5 (Oct. 22, 2020 Appraisal Report by Matthew Krauser) at 46.
[75]  *See id*. at 47–50.
[76]  Doc. 1 ¶ 1.i.(i).
[77]  Ex. D-1 (Sept. 28, 2020 Appraisal Report by William F. Rothman) at 45.

all meaningful vehicle traffic over the pipeline, he concluded that any future landowner is categorically prohibited from demolishing the existing buildings and developing the property for commercial use.[78] That isn't quite right.

At trial, Rothman admitted that he did not review the easement language that allows UGI to exempt the owner from any of the various property restrictions contained in the easement[79]—that is, the provision establishing that "Defendants shall not . . . use said permanent right of way or any part thereof for a road . . . *without first having obtained [UGI's] approval in writing*."[80] But this provision significantly alters the effect of the discussed "road" use prohibition. As Monagan explained, consistent with this "standard language" in its easement documentation, UGI "work[s] with the landowners all the time on a case-by-case basis to make sure [it's] accommodating what they want to do."[81] Indeed, Monagan stated that UGI would be willing to work with Pontius or any future owner of the Pontius property to "accommodate a [commercial] development," such as by granting the owner the ability to cross the pipeline with vehicle traffic or, if necessary, "put[ting] a concrete apron above the pipeline to help disburse the load."[82] This is supported by the actions UGI took after constructing the pipeline—that is, UGI re-

---

[78] *Id*. at 47.
[79] Doc. 172 (Oct. 12, 2021 Trial Tr. (W. Rothman Testimony)) at 75:2–15.
[80] Doc. 1 ¶ 1.i.(i) (emphasis added).
[81] Doc. 172 (Oct. 12, 2021 Trial Tr. (C. Monagan Testimony)) at 150:22–151:16.
[82] *Id*. at 151:21–153:21.

paved the existing parking lot and ingress/regress at the southwest end of the property.[83]

Because the easement language, by its very terms, permits the construction of a road above the pipeline so long as the landowner obtains UGI's written approval, Rothman's opinion that the landowner is categorically prohibited from doing so is incorrect. As such, Rothman's conclusions about the highest and best use of the Pontius property post-taking, as well as the comparable properties selected based on that highest and best use analysis, are likewise incorrect. Again, this leaves the Court with only Krauser's post-taking valuation of the Pontius property, as Krauser's highest and best use analysis for the property post-taking is predicated on an accurate understanding of this easement language.

Because the Court adopts UGI's proffered definition of "road" within the context of the Complaint and likewise agrees with UGI that Rothman incorrectly concluded that the easement language categorically prohibits vehicle traffic above the pipeline, the Court accepts Krauser's post-taking valuation of the Pontius property. Therefore, the Court finds that the post-taking value of the property is $599,000.[84]

---

[83]   *Id*. at 157:18 –159:3.
[84]   Ex. P-5 (Oct. 22, 2020 Appraisal Report by Matthew Krauser) at 50 (calculated by subtracting the "Permanent Easement Valuation" ($151,000) from the "Retrospective Market Value (Underlying Land) – Before Acquisition" ($750,000)).

## C.    Value of the Temporary Construction Easement

The final valuation relevant to the just compensation owed to Pontius concerns the temporary construction and access easements—that is, the value of the land encumbered temporarily for the construction of the pipeline. As with the pre- and post-taking valuations, Rothman and Krauser reach different conclusions on the value of this temporary taking.[85] And, as with the pre- and post-taking valuations, the Court agrees with Krauser.

Rothman calculated the value of the temporary construction easement by looking at the duration of the construction period (one year), the total size of the affected area (0.4577 acres or 19,937 sq. ft.), the price per acre of the Pontius property pre-taking (which he valued at $600,000), and the estimated rental rate (which he placed at 10%).[86] By multiplying these figures together (that is, "1 year x $600,000 x 0.4577 x 10%"), Rothman estimated the rental value at $27,462, which he rounded to $27,500.[87]

Krauser employed a similar methodology, but he used separate figures for the unit value (he valued the easement area at $10.73 per sq. ft.) and estimated rental rate (which he placed at 6%).[88] At trial, Krauser explained that although

---

[85]   *Compare* Ex. D-1 (Sept. 28, 2020 Appraisal Report by William F. Rothman) at 74, *with* Ex. P-5 (Oct. 22, 2020 Appraisal Report by Matthew Krauser) at 48.

[86]   Ex. D-1 (Sept. 28, 2020 Appraisal Report by William F. Rothman) at 74.

[87]   *Id.*

[88]   Ex. P-5 (Oct. 22, 2020 Appraisal Report by Matthew Krauser) at 48.

appraisers historically "always used a 10 percent return rate," due to the reduction in interest rates over the past decade, he no longer considers this "realistic."[89] As such, his firm "tempered what historically a lot of appraisers use as a 10 percent return down to a 6 percent return."[90] By multiplying the duration of the construction period, price per square foot of the easement area, the size of the affected area, and the estimated rental rate (that is, one year x $10.73 x 19,937 x 6%), Krauser estimated the rental value at $12,800.[91]

For the unit value, the Court accepts the figure Krauser applied ($10.73 per sq. ft.) because the figure Rothman used has already been rejected—as explained, Rothman's proposed price-per acre of the Pontius property pre-taking does not comport with the property's list price before the valuation date. Additionally, for the estimated rental rate, the Court accepts Krauser's stated rationale for applying the 6% rate.

For these reasons, the Court finds that the value of the temporary construction easement is $12,800.

## D.    Reconciling the Valuations

To determine the total amount UGI owes Pontius for the temporary and permanent easements it obtained to construct and maintain the pipeline, the Court

---

[89]   Doc. 172 (Oct. 12, 2021 Trial Tr. (M. Krauser Testimony)) at 218:3–13.
[90]   *Id*. at 218:14–16.
[91]   Ex. P-5 (Oct. 22, 2020 Appraisal Report by Matthew Krauser) at 48.

must reconcile the preceding three valuations: (a) the pre-taking value of the Pontius property, (b) the post-taking value of the Pontius property, and (c) the value of the temporary construction easement. This requires subtracting the post-taking value from the pre-taking value to reach a final determination on the permanent easement valuation and then adding to that the cost of the temporary construction easement.[92]

As explained, the Court made the following valuation determinations: (a) the pre-taking value of the Pontius property is $750,000; (b) the post-taking value of the property is $599,000; and (c) the value of the temporary construction easement is $12,800. Therefore, the damage to the value of the property is $163,800.

### E.    Professional Fees and Delay Compensation

Both parties acknowledge that under Pennsylvania law, the Court may award Pontius an allowance of "professional fees" and "delay compensation."[93] Specifically, 26 Pa. C.S. § 710 provides that "[t]he owner of any right, title or interest in real property acquired or injured by an acquiring agency . . . shall be reimbursed in an amount not to exceed $4,000, regardless of right, title or interest, as payment toward reasonable expenses actually incurred for appraisal, attorney and engineering fees." Additionally, 25 Pa. C.S. § 713 provides that

---

[92]   *See* Ex. D-1 (Sept. 28, 2020 Appraisal Report by William F. Rothman) at 74–75; Ex. P-5 (Oct. 22, 2020 Appraisal Report by Matthew Krauser) at 49.

[93]   *See* Doc. 151 at 13; Doc. 154 at 7.

"[c]ompensation for delay in payment shall be paid at an annual rate equal to the prime rate as listed in the first edition of The Wall Street Journal published in the year, plus 1%, not compounded from: (1) the date of relinquishment of possession of the condemned property by the condemnee; or (2) if possession is not required to effectual condemnation, the date of the condemnation."

Here, Pontius argues that under 26 Pa. C.S. § 710, he is entitled to professional fees. UGI does not seriously contest this issue.[94] The Court agrees with Pontius and awards him $4,000 in professional fees as provided by 26 Pa. C.S. § 710.

However, the parties dispute the amount Pontius deserves in delay compensation. Pontius asserts that he should receive the full amount, which he values at $183,797.13.[95] UGI disagrees, arguing that "as a matter of equity, the Court should exclude from such award the period of time that the U.S. District Court for the Middle District of Pennsylvania was effectively closed to civil trials due to the national COVID-19 public health emergency, from March 13, 2020 until June 28, 2021."[96] Given that this Court remained active through the COVID-19 pandemic and there is no indication that the trial date in this matter was delayed as a result of COVID-19, the Court finds UGI's appeal "as a matter of equity"

---

94  Doc. 151 at 13; *see also* Doc. 153 ¶ 20.
95  Doc. 155 ¶ 107; *see also* Doc. 155, Ex. A.
96  Doc. 151 at 13.

unpersuasive. As such, the Court awards Pontius the full amount of delay

compensation, which, based on the pre- and post-taking valuations detailed above,

comes to $46,449.75.[97]

## III.   CONCLUSION

Unlike his counterpart testifying on behalf of Pontius, UGI's appraisal

expert appropriately accounted for the Pontius property's listing history prior to the

easement and accurately interpreted the pertinent easement language. As such, the

Court accepts the pre- and post-taking valuations, as well as the value of the

temporary construction easement, offered by UGI's expert. The damage to the

value of the Pontius property caused by UGI's easement is therefore $163,800. As

Pontius is entitled to $4,000 in professional fees and $46,449.75 in delay

compensation, the total amount UGI owes Pontius is $214,249.75.

An appropriate Order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge

---

[97]   *See* Appendix.

## APPENDIX

## Delay Damages: Calculation Table

| Year | Date 1 | to | Date 2 | = | Days | ÷ | Days in the Year | = | t | * | Prime (%) | + | 1% | = | R |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2016 | 8/2/2016 | to | 12/31/2016 | = | 151 | ÷ | 366 | = | 0.413 | * | 3.5 | + | 1 | = | 4.50 |
| 2017 | 1/1/2017 | to | 12/31/2017 | = | 365 | ÷ | 365 | = | 1 | * | 3.75 | + | 1 | = | 4.75 |
| 2018 | 1/1/2018 | to | 12/31/2018 | = | 365 | ÷ | 365 | = | 1 | * | 4.5 | + | 1 | = | 5.50 |
| 2019 | 1/1/2019 | to | 12/31/2019 | = | 365 | ÷ | 365 | = | 1 | * | 5.5 | + | 1 | = | 6.50 |
| 2020 | 1/1/2020 | to | 12/31/2020 | = | 366 | ÷ | 366 | = | 1 | * | 4.75 | + | 1 | = | 5.75 |
| 2021 | 1/1/2021 | to | 12/13/2021 | = | 347 | ÷ | 365 | = | 0.951 | * | 3.25 | + | 1 | = | 4.09 |

| Principal | * | r | * | t | = | I |
|---|---|---|---|---|---|---|
| 163,800 | * | 0.045 | * | 0.413 | = | $3,044.22 |
| 163,800 | * | 0.048 | * | 1 | = | $7,862.40 |
| 163,800 | * | 0.055 | * | 1 | = | $9,009.00 |
| 163,800 | * | 0.065 | * | 1 | = | $10,647.00 |
| 163,800 | * | 0.058 | * | 1 | = | $9,500.40 |
| 163,800 | * | 0.041 | * | 0.951 | = | $6,386.73 |
| Total Interest | | | | | = | $46,449.75 |

## Key

P = Principal

I = Interest

r = Rate of Interest per year in decimal (i.e., r = R / 100)

R = Rate of Interest per year as a percent (i.e., R = r * 100)

t = Time Period involved in months or years (i.e., t = days / 365)